United States District Court
Middle District of Florida
Jacksonville Division

**UNITED STATES OF AMERICA FOR THE USE OF STONEBRIDGE CONSTRUCTION SERVICES, LLC,**

*Plaintiff, Counter-Defendant,*

**v.**

**NORTH AMERICAN SPECIALTY INSURANCE COMPANY,**                    **NO. 3:19-cv-514-BJD-PDB**

*Defendant, Counter-Plaintiff,
Third-Party Plaintiff,*

**v.**

**DEVELOPERS SURETY AND INDEMNITY COMPANY,**

*Third-Party Defendant.*

---

## Report and Recommendation[1]

This lawsuit, brought under the Miller Act, 40 U.S.C. §§ 3131–3134, involves bond claims from construction at United States Naval Station Mayport. The United States of America, through the United States Navy, was the owner. Artec Construction was the general contractor. North American Specialty Insurance ("NAS") was Artec's surety and issued a payment bond on Artec's behalf. Stonebridge Construction Services was Artec's subcontractor. Developers Surety and Indemnity was Stonebridge's surety and issued a

---

[1]Citations to page numbers are to page numbers generated by CM/ECF.

performance bond on Stonebridge's behalf. The Court conducted a bench trial, issued findings of fact and conclusions of law, and entered judgment ordering Stonebridge and Developers to pay NAS $946,608.55 and prejudgment interest.

Disputes over attorney's fees, taxable costs, and nontaxable expenses ensued. Stonebridge moves for fees against NAS, D183, and NAS moves for fees, costs, and expenses against Stonebridge and Developers, D184, D188, D197. Stonebridge and Developers' arguments include that a conflict of interest precludes a fee award to NAS. D204.

## I.    Overview

Artec terminated Stonebridge under a default provision in their subcontract and hired Centimark Roofing to complete the subcontract work. D179 at 6, 14–15. The United States later terminated Artec. D96 at 15. NAS took over the project and became Artec's assignee. *Id*. at 15–16.

In this lawsuit, Stonebridge claimed Artec owed Stonebridge $295,871.34 for pre-termination work. *Id*. at 2–3. Stonebridge demanded that amount from NAS under the payment bond. *Id*. at 2. NAS denied any amount was due under the payment bond and claimed Stonebridge breached the subcontract. *Id*. at 3. NAS demanded $946,608.55 spent to complete the subcontract work and $4,140,000.00 for a latent defect claim by the United States. *Id*. Lawyers with Etcheverry Harrison LLP represented NAS in defending and prosecuting those aspects of the dispute. D197 ¶5; D204 at 4. NAS also claimed Developers was liable under the performance bond, which

2

obligated Developers to indemnify Artec in the event of Stonebridge's default. D96 at 3–4, 17, 22–23. NAS sought $1,291,500.00 as the bond's penal sum. *Id.* at 3–4. Richard Buckley represented NAS in prosecuting that aspect of the dispute. D197 ¶4; D204 at 4.

## II.   Facts

Lawyers with Etcheverry Harrison have "represented Developers … for many, many years." D198 at 5.

Following Artec's termination of Stonebridge, an Etcheverry Harrison lawyer was included in an email to quickly schedule a meeting "due to the urgency caused by the … termination[.]" D204-1 at 2. The lawyer responded that the firm "is conflicted out" and asked everyone on the email to exclude the firm from "any further communications regarding this matter." *Id.* The lawyer informed a Developers representative, "We regret to inform you that we are already handling this matter on behalf of NAS, Artec's surety on the project. As a result[,] we cannot undertake representation of Developers … in this matter." D204-2 at 2. The representative asked whether the representation of NAS would present a conflict, considering that the firm represents and has "extensively represented" Developers. D204-3 at 2. The lawyer responded, "*At this point*, there is no conflict, but if [Developers] or Stonebridge commence a claim or litigation against Artec's surety NAS, then a conflict would arise, which would either have to be waived or which would require our Firm to withdraw as counsel for NAS in that matter only." *Id.*

3

The following year, in May 2019, this lawsuit began with Stonebridge bringing the payment bond claim against NAS. D1. NAS responded with two pleadings, one by an Etcheverry Harrison lawyer and one by Buckley. D15, D16. In the pleading by the Etcheverry Harrison lawyer, NAS answered the complaint, raised defenses, and counterclaimed for breach of the subcontract. D15. In the pleading by Buckley, NAS brought a counterclaim against Stonebridge and a third-party claim against Developers, both for breach of the performance bond. D16.

The following year, in January and February 2020, NAS amended both pleadings to add claims and defenses relating to warranty and guarantee clauses in the subcontract and the alleged latent defects. D26, D27. Again, an Etcheverry Harrison lawyer signed the pleading defending against the payment bond claim and raising the subcontract claim, D26, and Buckley signed the pleading raising the performance bond claim, D27.

Later, in February 2020, on the day of mediation, Developers raised a conflict of interest, D204-4 at 3, prompting Etcheverry Harrison lawyers to request a waiver:

> This letter requests Developers … waive any alleged or potential conflict of interest under Rule 4-1.7 of the Rules Regulating [T]he Florida Bar in connection with [this lawsuit]. … [Developers] issued subcontractor [a] performance bond[] on behalf of Stonebridge … and in favor of … Artec[.] [NAS] bonded Artec, and acquired Artec's rights after NAS completed the project.
>
> Etcheverry Harrison … represents NAS in defending Stonebridge's payment bond claim against NAS and asserting affirmative defenses solely against Stonebridge. The Firm does _not_ represent, and refused to represent, NAS with regard to any claim that NAS has asserted or might

assert directly against [Developers]. Accordingly, NAS has retained separate counsel, … Buckley …, to assert a performance bond claim against [Developers]. Because the Firm's representation is limited to NAS' interest against Stonebridge, and not [Developers], the Firm does not believe that there exists any actual and/or potential conflict of interest in connection with its continued representation of NAS in the … litigation.

Notwithstanding the foregoing, as [Developers] has expressed a concern with the possible existence of an actual and/or potential conflict of interests, this letter formally requests a waiver of any such alleged conflict under a complete reservation of rights.

…

[Developers] expressed concern and did not wish to proceed to mediation without a prior resolution of any potential conflicts of interest. To date, however, the Firm has been very careful to comply with all applicable [rules] concerning the existence of an actual and/or potential conflict of interest with [Developers]. By declining NAS' request that the Firm represent NAS with regard to any action against [Developers], the Firm has remained steadfast in its efforts and intentions not to become adverse to [Developers'] interests. Indeed, the Firm's position required NAS to retain and separately deal with Buckley concerning all matters directly asserted against [Developers].

It is the Firm's opinion that no conflict of interest exists[.] The Firm is not undertaking any adverse representation against [Developers][.] Nor is there any risk that the Firm's representation of [Developers] in other unrelated matters would be impaired by its representation of NAS in this matter[.] Given the separate legal representation of NAS as to its claims against [Developers], there is simply no conflict of interest under the … rules.

D204-4 at 2–4.

The following month, in March 2020, Developers provided a waiver through its corporate counsel:

5

We are in receipt of your correspondence … wherein you request [that Developers] … consent to your firm's representation of NAS in connection with Stonebridge's claim against NAS under the Artec Bond and NAS's affirmative claims solely against Stonebridge related to the Stonebridge bond. It is our understanding that NAS retained separate counsel, … Buckley …, to assert a performance bond claim against [Developers] under the Stonebridge Bond, and that your firm refused to represent NAS with regard to any claim it has or might assert directly against [Developers] in this matter.

Based on the information you provided …, this letter confirms that [Developers] is willing to provide this waiver of a conflict of interest subject to the following conditions:

> 1. Your firm's representation of NAS in the matter described above will not in any way involve the disclosure or compromise by the firm of [Developers'] confidential information.
>
> 2. Your firm acknowledges and agrees that it will not bring any actions for bad faith or otherwise seek extra-contractual damages against [Developers][.]
>
> 3. This conflict waiver is given with regard to surety matters only and your firm acknowledges that [Developers] does not waive any conflicts which may exist between the firm and [Developers] related to other matters not involving surety.
>
> 4. Your firm acknowledges and agrees that this does not constitute a blanket waiver going forward. This is a one-time waiver specific to these facts and circumstances. Your firm will seek a similar consent and waiver in the future if conflict should again arise in another matter or if information, facts and/or circumstances related to this matter materially change.

D204-5 at 2.

More than a year later, in March 2021, NAS, in a motion by an Etcheverry Harrison lawyer, asked for leave to amend NAS's answer and

defenses to Stonebridge's payment bond claim and NAS's subcontract counterclaim to address "the scope and extent of damages" that might trigger insurance coverage. D52 at 3 (quoted); D53. The next week, Buckley filed a "supplementary" motion:

> NAS is represented ... by two separate law firms. Because of possible conflicts, Etcheverry Harrison ... represents NAS in its [counter]claim[] against Stonebridge ... and Stonebridge's claims against NAS. ... Buckley ... represents NAS in a limited capacity. ... Buckley ... represents NAS in its performance bond claim against Developers ... and Stonebridge. As the ... latent defect claim ... now appears to encompass consequential damages to the work of other subcontractors, NAS also requests permission to amend its claims against Developers and [counterclaims against] Stonebridge under the performance bond.

D54 at 1–2.[2] Buckley incorporated the procedural history and arguments made by the Etcheverry Harrison lawyer in the motion for leave to amend NAS's answer to the payment bond claim and subcontract counterclaim. *See id*. at 2.

The undersigned conducted a status conference "to discuss the motions for leave to amend, [D52, D54], the conflict of interest referenced by [NAS], and any ethical or procedural issues presented by separate firms filing separate pleadings and separate motions for a single party." D55 at 1. For NAS, only an Etcheverry Harrison lawyer attended the conference. D198 at 2–4, 16, 21. The undersigned questioned the arrangement, observing that "we would typically see [Etcheverry Harrison lawyers] ... giving up representation and sending it to Buckley[] for all the claims that [NAS] has." *Id*. at 6. The Etcheverry

---

[2]NAS uses all capital letters for party names. The undersigned alters quotations from NAS's papers to omit that emphasis.

Harrison lawyer responded that this type of arrangement is uncommon but his firm has had this arrangement before. *Id*. He explained:

> And I agree with you, in a typical just lawsuit situation, it's much easier for one counsel to be involved. The problem here is we were involved in the underlying matter, the Artec claim, which is where Stonebridge is a subcontractor to. We were involved from day one with the government in Artec matters, so we have superior knowledge as counsel for [NAS]. We know everything that went on in the underlying proceedings. And [NAS] did not want to lose the benefit of its knowledgeable counsel by just assigning the case to someone else.
>
> The bond claims themselves only arise after the fact and did not require underlying knowledge of what happened, which is why it was much easier just bringing in … Buckley to represent them for perspective of the Developers claims.
>
> …
>
> [T]he knowledge that we have as a firm relates to the Artec and government issues, which ultimately go back to the Stonebridge contract, not necessarily the Developers [performance] bond. The bond itself sort of just falls into place based on what happens with Stonebridge.
>
> …
>
> The only way that the -- an arguable conflict … could arise … is if the Court asked for oral argument. At that point what we would do is we would ask you to split [NAS]'s oral argument time between … Buckley and myself so that I could argue this -- the contract issues and he could argue the bond issues.

*Id*. at 6–8, 12. Ultimately, with NAS's agreement, the Court permitted the arrangement to continue with the understanding that the parties would work out the procedural issues presented by the arrangement. *Id*. at 8–20. With leave, NAS filed the two newly amended pleadings. D57, D59.

8

The following year, in September 2022, the action proceeded to the bench trial, D146, D152–56, D168, D169, on Stonebridge's payment bond claim against NAS, NAS's subcontract counterclaim against Stonebridge, NAS's performance bond claim against Developers, and NAS's pass-through-damages claim against Stonebridge and Developers, D179 at 19–27.

When the trial ended, Developers moved for judgment on NAS's performance bond claim. D169 at 180–84. An Etcheverry Harrison lawyer argued against the motion, including "on behalf of" Buckley. *Id*. at 184–85. Developers' lawyer interjected, "Your Honor …, just to be clear, … there is a clear line of demar[c]ation in this case. [Buckley, who is absent,] represents NAS for the affirmative claims against [Developers]. [The Etcheverry Harrison lawyer] does not." *Id*. at 185. The Court stated that the motions would be taken under advisement and the Court would review submissions from the Etcheverry Harrison lawyer and Buckley. *Id*.

NAS submitted a single set of proposed findings of fact and conclusions of law signed by both an Etcheverry Harrison lawyer and Buckley. D176. In Developers' proposed findings of fact and conclusions of law, Developers explained that "to trigger Developers' liability under the [performance bond], NAS had to establish that Stonebridge committed a material breach of and defaulted on the Subcontract." D178 ¶4.

After the bench trial, the Court issued these findings of fact and conclusions of law:

## I.   Findings of Fact

### a.   <u>Overview</u>

…

### b.   <u>The Prime Contract</u>

…

### c.   <u>The Subcontract</u>

On May 9, 2017, Stonebridge and Artec entered into a Subcontract. The Subcontract incorporates … the terms and conditions of the Prime Contract. Stonebridge was identified as the Subcontractor and Artec as the Contractor. Stonebridge was to install a Roof System and to install the associated insulated metal wall panel system (the Wall System) to construct the entire contemplated building.

When the Subcontract was formed, Stonebridge had neither installed this specific Roof System nor worked with the roofing manufacturer, MBCI Metal Roof and Wall Systems (MBCI). As part of Stonebridge's installation of the Roof System, MBCI required inspections of the work.

Particularly relevant to this lawsuit is Subcontract Article "Default and Damages." The article explains when the Subcontractor will be considered in default. It further explains that if a Subcontractor fails to cure a default within three business days, then the Contractor may … terminate the Subcontract, "make demand on Subcontractor's surety to perform the Subcontract and/or to indemnify Contractor for costs arising from the default[,]" or "employ other firms or persons at Subcontractor's cost to complete or correct all or any part of the [w]ork[.]"

The parties dispute (1) whether Stonebridge sufficiently completed work under the Subcontract, (2) if the work was not sufficiently completed, then whether Artec properly terminated Stonebridge, and (3) whether Artec reasonably had to hire a different contractor to fix the Roofing System.

10

### d.   Work Performed by Stonebridge and Notices Sent by Artec

In May 2017, Artec and Stonebridge entered into the Subcontract for Stonebridge to install a roof for the Project. On July 14, 2017, Artec sent Stonebridge a "48 Hour Notice" related to scheduling issues with the Project and Stonebridge's purported inability to timely get the materials needed to complete the roof.

On December 21, 2017, Artec sent Stonebridge another "48 Hour Notice," this time relating to "lack of manpower" and Stonebridge being "weeks behind schedule."

On February 22, 2018, Artec sent Stonebridge a "Notice of Non-Compliance with Contract Requirements." This Notice came after the manufacturer of the Project's roof system, MBCI, inspected Stonebridge's work to determine whether a warranty would be issuable. MBCI identified five deficiencies that needed corrective action and explained that "[d]ue to the severity of the deficiencies[,] another inspection [would] be required after all repairs [were] completed." On the same day in February, Artec also sent Stonebridge a "48 Hour Notice," where Artec expressed concerns with Stonebridge's manpower on the Project. On February 23, 2018, Artec followed up with Stonebridge, claiming its representatives found "water stained drywall[,] including the presence of mold[.]"

On March 2, 2018, Artec issued to Stonebridge a "Notice of Default." In the Notice of Default, Artec related Stonebridge's noncompliance with the Subcontract back to the February 22, 2018 correspondence.

On March 8, 2018, Artec again issued to Stonebridge a "Notice of Non-Compliance with Contract Requirements." This Notice of Non-Compliance was related to Stonebridge's inferior work quality which prevented MBCI from issuing a warranty after MBCI's second inspection. On March 19, 2018, Artec notified Developers that Stonebridge had not corrected its deficiencies and lack of production effort.

### e.   MBCI's Inspections Reveal Stonebridge's Deficient Work on the Project

To obtain a warranty on the Roof System, the roof had to be inspected and approved by MBCI. In January 2018, MBCI inspected the Roof

11

System, identified five deficiencies, and explained those deficiencies had to be corrected before a warranty would issue.

On March 12, 2018, MBCI issued its second inspection report. In the second inspection, MBCI identified three deficiencies that needed to be corrected before a warranty would issue. Of those three, one deficiency was a carry-over from the first inspection. On March 19, 2018, Artec notified Developers, Stonebridge's surety, that Stonebridge had not corrected the deficiencies and manpower issues identified previously—though the specific allegations are vague. On March 20, 2018, Artec issued a third "Notice of Non-Compliance with Contract Requirements" to Stonebridge.

Then, on March 21, 2018, Artec sent … Stonebridge a "Notice of Default." Within the Notice, Artec identified the two MBCI reports and the construction pace as reasons for Stonebridge's default. Artec provided Stonebridge three business days to cure the perceived default. Developers received a copy of the March 21 Notice.

    On March 22, 2018, Stonebridge responded to each deficiency alleged in the March 21 Notice. Stonebridge argues it either cured the perceived deficiencies on sight during the second MBCI inspection or had a plan to cure any deficiency left over. As explained below, Stonebridge did not cure all of the alleged deficiencies.

In Artec's March 21 Notice for Default, Artec alleged these deficiencies:

        1.    Defective Eave Installation
        2.    Wrong Tape Sealer Used
        3.    Defective Back-Up Plate Installation
        4.    Defective Installation of Panels on the Low Bay Roof
        5.    Rust on the Roof Panels Due to Improper Storage
        6.    Defective End Lap Installation
        7.    Defective Panel Placement
        8.    Stonebridge's Non-Compliance with the Project Schedule

On March 30, 2018, Ronald Haynes, an engineer with the Navy, inspected the roof. Mr. Haynes was asked by Navy personnel to opine on "whether the roof installation at that [time] was acceptable, or if there were some measures that needed to be taken to correct [any] issues." Mr. Haynes memorialized his opinions in a report. The Haynes' Report

12

is helpful in evaluating the alleged deficiencies. Also helpful is the third MBCI inspection report, issued in April 2018.

[The Court found that the first, second, third, fifth, and eighth alleged deficiencies do not contribute to a breach by Stonebridge.]

The fourth, sixth, and seventh deficiencies contribute to Stonebridge's breach because they each needed corrective action to both finish the Project and pass inspection so a warranty would issue.

Relating to the fourth deficiency, Mr. Haynes noted that the alignment of the roof panels needed to be adjusted before the north admin roof area could be completed and sealed. Mr. Haynes also identified "[l]egitimate concerns" about holes in the roof. … During the May 1, 2018 inspection by MBCI, it noted the high bay "substructure was not in plane slopes" and that such a deficiency would prevent the roof from functioning properly. The replacement contractor also noted the deficiency. …

Stonebridge avers the fourth deficiency was an approved deviation; however the evidence does not support this conclusion. In the March 23, 2018 Daily Construction Report, Stonebridge acknowledges the "upper section of the roof is out of module" and that it was directed to "remove [the] second layer of roof panels" and "re-install them to specs." Further, nothing in the March 27, 2018 Daily Construction Report suggests Artec or MBCI approved any deviation. The April 18th Report indicates issues with the installation of the high bay roof, noting it was "on hold due to problems in the steel that [Stonebridge was] currently working on with MBCI" to find a solution to "install the panels without [the panels] ripping apart within a couple years." Finally, the April 25th Report suggests MBCI approved of the panel layout, but nothing in the Report indicates that MBCI's approval would lead to a warranty issuing, and the next [MBCI] report, dated May 1, 2018, indicates otherwise.

Relating to the sixth deficiency in the end-lap installation, Mr. Haynes identified poor workmanship in the end laps, including missing or offset screws and exposed fasteners. Stonebridge avers that "these were works in progress [ ] that Stonebridge cured, and therefore, were not grounds to terminate." On June 7, 2018, MBCI sent a letter to Artec. In the letter, MBCI advised Artec that "the lower roof area with the end lap condition will require removal of all end lap panels due to the previous installation method." Stonebridge points the Court to Mr. Dery's testimony to support the idea that the end laps were properly installed; however, the

13

transcript citations suggest no such conclusion. To be clear, the subcontract explains Stonebridge had three business days to cure a default. If a cure could not be completed within three business days, the[n] Stonebridge had to provide an acceptable plan to cure the default. Stonebridge neither cured the end lap deficiency, nor provided a clear plan to cure the deficiency. The deficiency existed at the time of termination.

Relating to the seventh deficiency about the defective panel placement, Mr. Haynes noted that the "blue sheet metal flashing receiver that exits the wall below the wall panel termination slopes back into the wall [instead] of sloping outboard." This condition could not be corrected without removing and reinstalling the wall panels. Stonebridge argues this deficiency is not listed in the third MBCI inspection report. To the contrary, the third report notes that the "substructure was not in plane slope." The deficiency both existed and persisted from the March 21 default date.

Stonebridge argues that because it was still working on the Project that these deficiencies would be cured. The record does not support a finding that between March 30, 2018 and May 3, 2018 all the deficiencies were cured. In the third MBCI report, MBCI noted an end lap deficiency, improper fasteners were installed, [and] that the high bay was not in the proper slope. MBCI would not issue a warranty with the deficiencies noted in the third report. The issuance of a warranty from MBCI is a material condition of the Subcontract. Artec properly noticed Stonebridge of its default, related to the deficient work preventing MBCI from issuing a warranty. Artec properly terminated Stonebridge on May 3, 2018. Under the Subcontract, Artec need not pay Stonebridge for damages incurred during the default period.

After reviewing the testimony and evidence in the record, including photographs and diagrams submitted to the Court, the Court finds Stonebridge's work on the project did not meet the standard of work required under the Subcontract.

## f.     **Artec Canceling the Subcontract**

After the March 21 Notice of Default, on April 12, 2018, Artec, Stonebridge, and Developers met on-site. During the meeting, [Stonebridge] argues all parties allegedly agreed that Developers would monitor Stonebridge's work and such monitoring would cure the issues

raised in the March 21 Notice. No such agreement was proven. The Court notes that Developer's corporate representative provided testimony about the alleged conversation among the parties on April 12, 2018. However, a review of the documentary evidence does not support the purported verbal agreement Developers argues happened at the meeting. Ms. Schildbach testified that Artec agreed to the verbal solution and that the agreement "was communicated by the consultant[,]" Qualex. A review of the testimony supports no such agreement.

On May 3, 2018, Artec formally terminated Stonebridge. Artec related its termination back to the default notice dated March 21, 2018. Artec then hired Centimark to remediate Stonebridge's work and complete the Project, and Centimark's scope of work included work to both the roof and wall systems. By November 2018, Centimark completed the work and obtained MBCI's warranty.

### g.   **The Water Damage to the Building Cannot be Solely Attributed to Stonebridge**

NAS brings a claim for pass-through damages against Stonebridge for "subsequently discovered defects." The Owner—that is the Navy—notified Artec on March 3, 2020 that it discovered latent defects related to wall leaks.

While Artec provided evidence showing the water damage was present while Stonebridge worked on the Project, it did not show that water damage was only attributable to Stonebridge's construction on the roof. The water damage is attributable to the scheduling decisions made by Artec that negatively affected Stonebridge's work.

Specific to the leak issue, Artec instructed Stonebridge to construct the low bay roof before the wall panels were installed. In doing so, the sealant required to seal the roof would not dry properly. Both parties acknowledged the sealant was not drying, and they agreed to place tarps over the roof to ameliorate the problem.

While evidence shows the water damage entered the building through the roof, the record shows Stonebridge completed work according to Artec's scheduling demands. The record also shows that Stonebridge worked with Artec to prevent further damage once a leak was noticed. The record further reflects Artec directed Centimark to not perform a

"water tight" temporary fix after the new subcontractor was brought onto the project. Stonebridge is not liable for any damages related to the leaking roof.

### h.   Artec Did Not Pretextually Terminate Stonebridge

Stonebridge argues Artec cancelled the contract for cause, pretextually, so that Stonebridge could not have engineers perform a structural inspection of the high bay roof. To support this argument, Stonebridge cross-examined David Mathews, Vice President of Claims at Swiss Re Corporate American Insurance Company, as successor to NAS. During this questioning, Stonebridge brought up various litigation NAS and Artec had been engaged in around the time of the purported default; however, Stonebridge failed to explain why the Court should consider the other lawsuits to determine whether a default occurred between Stonebridge and Artec. Stonebridge argues NAS "wanted to avoid" Stonebridge inspecting the roof "at all costs." The Court is not persuaded by this argument.

First, to be clear, the Project was constructed on property owned by the Federal Government, specifically on a military base. Stonebridge would not have been able to invite inspectors to evaluate the roof without preclearance. …

Second, Developers visited the site on April 12, 2018. No testimony suggests that either Developers or Stonebridge was prevented from bringing inspectors during the default period, and indeed, Developers brought a consultant to the April 12th meeting. Stonebridge presents its "smoking gun" evidence as an email from Wayne Perrault, Artec's "site safety inspector" and Project Superintendent. The email, from Mr. Perrault to a representative for the structural engineer inspector for the Project writ large, vaguely states, "Thought you should know that the roofing company may be challenging you [sic] license and your inspection results. This could get bad." This email was sent on April 30, 2018.

Stonebridge argues that by April 27, 2018, Artec knew Stonebridge had procured its own engineers to inspect the roof; however, the email thread reflects no such finding. In fact, to the contrary, the email thread shows that Artec demanded that Stonebridge "immediately provide a professional engineer to contradict the veracity" of Artec's inspectors. Three days later, Stonebridge emailed Artec explaining Stonebridge had

16

procured a structural engineer to review Artec's engineer's findings. Stonebridge explained the engineer would be available to inspect the roof on May 4, 2018, noting that this inspection schedule would be subject to the engineer being approved to gain access to the military base.

Returning to the Subcontract, Stonebridge had three business days to cure any default. Stonebridge and Developers argue the Court should consider a date in May 2018 as the "default notice" date and find NAS terminated Stonebridge without allowing Stonebridge the opportunity to cure. Using this flawed logic, then Stonebridge was notified on April 27, 2018 to provide a professional engineer to inspect the site. Stonebridge, by its own admission, 1) responded to the email on May 3, 2018—four business days after NAS' demand and 2) did not schedule the engineer to inspect the site until May 4, 2018—both outside of the cure period and not a guaranteed plan due to the limitations to visit a naval base without preclearance.

To be clear, using an April or May 2018 default date is flawed. The Court uses March 21, 2018 as the actual Notice of Default for the reasons already explained.

## II.   Claims and Analysis

### a.   Stonebridge's Claim Against NAS: Miller Act Violation

[Stonebridge] sued [NAS] for violating the Miller Act, 40 U.S.C. §§ 3131–3134.

…

Stonebridge alleges it is entitled to $295,871.34 in unpaid balances for the work completed on the Project. NAS asserted nine affirmative defenses in its Answer, but only argued that Stonebridge breached the Subcontract and therefore cannot recover under the Miller Act. The Court considers Stonebridge's claim against NAS' sole remaining defense.

The Miller Act provides:

Every person that has furnished labor or material in carrying out work provided for in a contract for which a

17

payment bond is furnished under section 3131 of this title
and that has not been paid in full within 90 days after the
day on which the person did or performed the last of the
labor or furnished or supplied the material for which the
claim is made may bring a civil action on the payment bond
for the amount unpaid at the time the civil action is
brought and may prosecute the action to final execution
and judgment for the amount due.

"Although this action was brought under the Miller Act, state law
governs whether" either party "materially breached the subcontract."
The parties agree that Florida law governs the Court's analysis. …

"For a breach of contract claim, Florida law requires the plaintiff to
plead and establish: (1) the existence of a contract; (2) a material breach
of that contract; and (3) damages resulting from the breach." Here, the
parties do not dispute the existence of a contract.

"To constitute a vital or material breach, a defendant's non-performance
must be such as to go to the essence of the contract."

Here, to support a material breach, Stonebridge argues Artec
terminated Stonebridge in May 2018 after Stonebridge had hired
engineers to inspect the high bay roof. The Court rejects this argument.

Further, after Centimark completed its work on the Project, NAS paid
to Stonebridge $315,398.00 for the remaining Subcontract balances,
which included $229,418 in billed but unpaid balances owed to
Stonebridge. The crux of Stonebridge's argument is that it billed NAS
for work completed and was not paid for that work. The Court finds that,
to the contrary, Stonebridge was paid for amounts billed, even after it
was terminated by NAS.

The Court now turns to NAS' breach of contract defense.

**b.**     **Stonebridge Breached the Subcontract**

The Court begins this analysis starting with March 21, 2018 as the start
date. Stonebridge materially breached the contract when, by March 26,
2018, it had not cured or made efforts to cure all seven listed deficiencies.
The deficiencies the Court noted that still existed in May 2018
constituted a material breach because the defects were such that a

warranty would not issue and remediation was needed. Stonebridge materially breached the Subcontract on March 26, 2018 and NAS was within its right to terminate Stonebridge in May 2018 for the continuing, material breach.

### c.   NAS' Counterclaim Against Stonebridge

NAS brings a one-count counterclaim against Stonebridge for breach of contract. The Court found Stonebridge breached the Subcontract. What remains is what Stonebridge owes NAS in damages.

"[T]he measure of damages for breaching a construction contract is 'the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste.'"

After Stonebridge was terminated, NAS hired Centimark to complete the Project. In total, the record shows NAS paid Centimark $1,262,006.55 to fix the issues created by Stonebridge's poor workmanship and finish the Project. NAS' total direct costs associated with the repair and completion of Stonebridge's Subcontract is $946,608.55 after NAS provided Stonebridge with a credit for the remaining Subcontract balances. After Centimark completed work on the Project, MBCI issued a warranty on the roofing system. Centimark's work was necessary and reasonable to complete the Project.

Stonebridge owes NAS $946,608.55 in damages.

### d.   NAS' Counterclaim Against Developers

NAS brings a breach of performance bond claim against Developers, claiming that not only did Developers breach the performance bond, but it is also liable for subsequently discovered defects. At trial, Developers moved, ore tenus, for the Court to find NAS failed to prove its counterclaim against Developers. The Court considers both arguments together.

On March 21, 2018, both Stonebridge and Developers received the Notice of Default from Artec. The crux of Developer's argument is that the surety was not allowed to investigate the purported default and was not allowed an opportunity to comply with Artec's demands in May 2018.

19

According to Developers, "to trigger Developers' liability under the Bond, NAS had to establish that Stonebridge committed a material breach of and defaulted on the Subcontract." The Court finds Stonebridge materially breached the Subcontract.

Developers also argues that Artec and NAS as its assignee deprived Developers of its right to perform and complete the Subcontract. "As a general rule, a surety's liability on a bond is determined strictly from the terms and conditions of the bond agreement."

The bond agreement between Developers and Stonebridge is an indemnity bond, not a completion bond. There is no language in the bond to suggest Developers had a right to perform and complete the bond. The language in the bond and incorporated from the Subcontract indicates Developers is jointly and severally liable for Stonebridge's default and resulting material breach.

Further, as the Court explained, after the March 21 Default, Developers not only had the opportunity to inspect and monitor Stonebridge's work, but it was also allowed to visit the site with a consultant to evaluate Stonebridge's work. Even if the Court concluded Developers had a right to perform, Artec allowed Developers the opportunity in April: an opportunity of which Developers did not take full advantage.

### e.   <u>NAS' Claims for Pass-Through Damages</u>

NAS also brings a claim for damages for subsequently discovered defects. While the Court found that Stonebridge is not solely responsible for any water damage, as a matter of law, NAS is not entitled to the $4,140,000.00 in "pass-through" damages.

"It has long been accepted in Florida that a party claiming economic losses must produce evidence justifying a definite amount." "Economic damages may not be founded on jury speculation or guesswork and must rest on some reasonable factual basis." The party seeking economic damages "has the burden of presenting evidence justifying a specific and definite amount of economic damages." "Where there is no evidence to justify any amount on a claim for economic damages, [the opposing party] is entitled to judgment on the claim."

NAS bases its claim for $4,140,000.00 on an "anticipated" demand from the Navy. At trial, NAS admitted that it is involved in an ongoing

investigation of the Navy's allegations. Further, NAS and the Navy had not reached an agreement as to what the actual damages were or the monetary amount required to fix any purported damages. NAS presented no evidence, other than hearsay evidence not allowed under any exception, to verify or justify the purported $4,140,000.00 in damages. Accordingly, the Court finds the category of damages to be too speculative to award, notwithstanding the Court's previous finding that any damage attributable to a leak cannot solely be attributable to Stonebridge.[footnote]

[Footnote:] To be clear, NAS argues that because of Stonebridge's material breach, it had to hire Centimark to remediate defective construction and finish the Project. The Court agrees that Centimark's work was necessary and that Centimark indeed finished the Project satisfactorily given the issuance of a warranty from MBCI. Any pass through damages, discovered in August 2019—more than one year after Stonebridge had been terminated, months after Stonebridge filed this lawsuit, and almost one calendar year after Centimark finished its remedial work—cannot be attributed solely, if at all, to Stonebridge. There is too much speculation—as to who is responsible for the damage, the actual value of the damage, and the cost to remediate the issue—for the Court to award any pass through damages.

D179 at 1–27 (some alterations in original; internal citations and footnotes omitted).

Based on those findings of fact and conclusions of law, the Court concluded:

Accordingly, after due consideration, it is

**ORDERED:**

1.     Stonebridge and Developers shall pay NAS $946,608.55 plus prejudgment interest under Fla. Sta. § 55.03 accruing from March 21, 2018 through the date of this Order.

2.     [Developers'] <u>ore</u> <u>tenus</u> motion for judgment on partial findings is **DENIED**.

3.    To the extent that any party believes to be entitled to attorneys' fees, any motion for costs and attorneys' fees shall be filed after meaningful conferral under Local Rule 3.01(g) by **October 20, 2023**.

…

*Id*. at 27.

The judgment for $946,608.55 plus prejudgment interest for NAS and against Stonebridge and Developers followed. D180.

## III.   Motions

Four motions are before the Court. D183, D184, D188, D197.

In the first motion, Stonebridge argues it is entitled to fees against NAS under the stipulation and Article 10 of Artec and Stonebridge's subcontract, contending Stonebridge is the prevailing party because it prevailed on NAS's claim for $4,100,000.00 in damages for the alleged latent defects, which "became the significant issue of the litigation" once NAS amended its counterclaim. D183 at 2–3, 6–7. Stonebridge emphasizes that NAS demanded $5,086,608.55 in damages but received only $946,608.55—18.6 percent of the demand. *Id*. at 2. Stonebridge requests "$652,085.00 in … fees, $449,213.00 of which were incurred in defending" against the latent defect claim. *Id*. at 3. Stonebridge alternatively argues that no party is the prevailing party because both Stonebridge and NAS "prevailed on various aspects of their claims and lost on others[.]" *Id*. at 7–8. Stonebridge concedes, "NAS, as assignee of Artec, is entitled to its reasonable attorney's fees incurred in prosecuting its breach of bond claim against Developers pursuant to [section] 627.756, [Florida

Statutes,] … and therefore, NAS is entitled to the recovery of its reasonable fees incurred by [Buckley] against Developers." *Id*. at 2 n.1.

In the second motion, NAS argues it is entitled to fees against Stonebridge under the stipulation and Article 5 of Artec and Stonebridge's subcontract, contending NAS is the prevailing party because it prevailed on its defense to Stonebridge's payment bond claim, its subcontract counterclaim against Stonebridge, and its performance bond claim against Developers, resulting in the $946,608.55 judgment in its favor. D184 at 2–4, 3 n.3. NAS requests $711,124.00 in fees for work by timekeepers with Etcheverry Harrison. *Id*. at 4. An Etcheverry Harrison lawyer signed the motion. *Id*. at 9.

In the third motion, NAS argues it is entitled to "taxable costs" of $25,628.93 and "expert costs" of $159,357.33 against Stonebridge under Articles 5 and 10 of Artec and Stonebridge's subcontract; the performance bond; Rule 54(d), Federal Rules of Civil Procedure; and 28 U.S.C. § 1920. D188 at 1–4. An Etcheverry Harrison lawyer signed the motion. *Id*. at 10.

Stonebridge "concedes" that NAS is entitled to recover its costs under Florida law providing that "the party recovering judgment—as opposed to the prevailing party … —is entitled to an award of costs." D186 at 2 (quoting *Hawks v. Libit*, 251 So. 3d 321, 323 (Fla. 2d DCA 2018)). Stonebridge also "agrees that NAS is entitled to taxable costs" under Rule 54(d). *Id*. at 3. Stonebridge argues that the costs are limited to the § 1920 categories and NAS provides documentation sufficient to establish entitlement to only $9,433.27 in taxable costs. *Id*. at 2–3. Stonebridge observes that NAS filed an untimely

23

amended bill of costs and is not entitled to any costs not first requested in the timely bill of costs.[3] D190 at 2.

In the fourth motion, NAS moves for "fees and costs" on its performance bond claim against Stonebridge and Developers under the stipulation, the performance bond, section 627.756, Rule 54(d), and § 1920. D197 at 1–2, 5–13. NAS argues:

> As Developers and Stonebridge were ordered to pay, jointly and severally, $946,608.55 to NAS, there is no dispute by Developers and Stonebridge, on the performance bond claim, that NAS is the prevailing party on significant issues. Developers and Stonebridge acknowledge that NAS should be entitled to recover its reasonable attorneys fees and costs incurred by … Buckley … in prosecuting the Performance Bond claim (and defending against [the] affirmative defenses to the Performance Bond claim). However, Developers and Stonebridge contend that NAS should not be entitled to recover for any of its attorneys fees and costs that NAS incurred in prosecuting the breach of contract under the Performance Bond claim. However, because Developers' liability under the Bond was only "triggered" until after NAS established that Stonebridge committed a material breach of the Subcontract (and default), NAS asserts that NAS should be entitled to recover a significant portion of its attorneys fees and costs prosecuting the breach of contract action under the Performance Bond claim.

> NAS' breach of contract claim was intertwined and/or "bound up" with NAS' Performance Bond claim. Developers represented to the Court that NAS' breach of contract claim was 'bound up" with NAS' Performance Bond Claim. Developers stated, "to trigger Developers' liability under the Bond, NAS had to establish that Stonebridge committed a material

---

[3]"A motion, other legal memorandum, or brief may not incorporate by reference all or part of any other motion, legal memorandum, or brief." Local Rule 3.01(f). In response to NAS's amended motion on costs and expenses, Stonebridge incorporates the arguments it made in its original response. D186, D190. Although Stonebridge violates the rule, in the interest of efficiency and to avoid more papers on an already crowded docket, the undersigned did not strike the response.

breach of and defaulted on the Subcontract." To now claim that the two claims are not intertwined is disingenuous.

*Id.* at 6 (emphasis and internal citations omitted). NAS continues:

> [M]any of the allegations that NAS had to prove/establish to recover on NAS' breach of contract claim were very similar [to] NAS' breach of Performance Bond claim. ... However, Buckley ... did not conduct discovery twice on same set of operative facts. Etcheverry Harrison, co-counsel, took the lead and conducted much of the discovery on the operative facts. Buckley ... relied on the work performed by ... Etcheverry Harrison ... to prove these operative facts. The legal work performed by ... Etcheverry Harrison ... was absolutely necessary to prove NAS' breach of the Performance Bond Claim. Therefore, a substantial portion of the legal work performed by ... Etcheverry Harrison ... should be recoverable from Developers and Stonebridge under the Performance Bond.

*Id.* at 11–12 (emphasis omitted). On costs, NAS states, "For the same reason that the breach of contract claim and the Performance Bond claim are intertwined, NAS seeks the costs previously requested." *Id.* at 12. NAS adds, "Because NAS incurred these costs in its prosecution of both the ... Performance Bond Claim and the breach of contract claim, NAS seeks these costs from Developers under the Performance Bond." *Id.* at 12 n.10. NAS states the Buckley fees "are about $224,628.08," while "the amount sought" by Etcheverry Harrison is $711,124.00. *Id.* at 8 (citing D184 at 4). "Therefore," NAS contends, "if the Court finds that NAS' breach of Contract [counter]claim is intertwined/bound up with [the] NAS Performance Bond Claim, then Developers and Stonebridge could be liable up to $935,752.08 ($224,628.08 + $711,124.00) in attorneys fees[, but] if [the] Court determines that the breach of contract action and the Performance Bond claim are not intertwined/bound

up, then Developers and Stonebridge could be liable up to $224,628.08 in attorneys fees." *Id*. at 8–9. Buckley signed the motion. *Id*. at 13.

Stonebridge and Developers reassert that NAS is not the prevailing party entitled to fees "because the Court denied a supermajority of NAS's allegations of breach (defeated 67% of NAS's claims) and outright rejected $4,455,398.00 of NAS's alleged damages (disproved 83% of NAS's alleged damages)." D204 at 3 (emphasis omitted).

They also add the conflict-of-interest argument. *Id*. at 1–3, 8–12. They contend that the waiver was given with the understanding that the Etcheverry Harrison lawyers would prosecute no claim against Developers and that the Court permitted the arrangement based on that representation and the representation that NAS's subcontract and performance bond claims were essentially "separate lawsuits." *Id*. at 2. They assert:

> Now, after five years of litigation, NAS has reversed its position and claims entitlement to attorneys' fees for both Etcheverry and Buckley for all their claims against Stonebridge and Developers in an amount nearly equal to the final judgment in this case. NAS even seeks thousands of dollars in attorneys' fees related to how its counsel planned to wriggle around the admitted conflict issue in the first place, its plan to hire "shadow counsel" to prosecute claims against Developers, and for time Etcheverry spent working to assist Buckley with the claims against Developers.

*Id*. at 3 (emphasis and internal citations omitted). According to Stonebridge and Developers, "It is clear from [an Etcheverry Harrison lawyer arguing 'on behalf of Buckley' at the end of trial], and the time sheet information that has now been provided to the parties, that Etcheverry acted directly adverse to Developers throughout this matter and did so despite the admitted conflict and

26

contrary to the numerous prior representations to all parties and this Court for years." *Id.* at 7. They argue "th[e] conflict acts as an absolute bar to any right to attorneys' fees and costs." *Id.* at 8.

NAS replies that it is entitled to fees and costs against Stonebridge and Developers under the performance bond and against Developers under section 627.756. D209 at 1. NAS emphasizes that it—not Etcheverry Harrison— requests its fees from Stonebridge and Developers. *Id.* at 4. NAS argues that Developers waived the conflict of interest, emphasizing that Developers is a "large and established insurance company/surety" that knew that "NAS had to prove a breach of the construction contract before NAS could recover on the performance bond claim." *Id.* Buckley signed the reply. *Id.* at 7.

## IV.   Law & Analysis

### A.   *Attorney's Fees*[4]

Under the "American Rule," each party in a lawsuit ordinarily bears its own fees unless there is express statutory or contractual authorization to the contrary. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). Florida follows this rule. *Trytek v. Gale Indus., Inc.*, 3 So. 3d 1194, 1198 (Fla. 2009). The parties agree and are correct that Florida substantive law governs fees. *See* D183 at 3; D184 at 2 n.2; D197 at 5.

---

[4]Quotations of statutes are to statutes in effect in 2017 when the subcontract was signed and the bonds were issued. D163-22 at 1, 3, 5. The law has been changed, but neither party argues materially so. *See* D209 at 2 & 2 n.1 (NAS's reply relying on the version of Fla. Stat. § 627.756(1) in effect in 2017).

Considering differing standards, the undersigned addresses fees under the stipulation in the joint pretrial statement and Articles 5 and 10 of Artec's and Stonebridge's subcontract and separately addresses fees under Developers' performance bond and section 627.756.

1.   *Fees Under the Stipulation and Articles 5 and 10 of Artec and Stonebridge's Subcontract*

Under the stipulation, "the party prevailing on the significant issues shall be entitled to recover its reasonable attorneys' fees incurred in the prosecution and defense of the instant claims." D96 at 46–47. Under Article 5 of Artec and Stonebridge's subcontract, "If [Stonebridge] fails to fully or timely comply with any duty imposed by Legal Requirements or this Subcontract … it is in default [and] will be liable to [Artec] for all losses, costs (including attorneys' fees and court costs)[,] damages, claims, suits, fines or penalties incurred by [Artec] or its sureties to the extent caused by the default." D163-21 at 12. Under Article 10 of Artec and Stonebridge's subcontract, "the prevailing party shall be entitled to an award of their attorney's fees … should suit be commenced by either party." *Id.* at 20. The parties agree (or at least do not dispute) that a fee award under the stipulation, Article 5, and Article 10 is to the "prevailing party."[5] *See* D183 at 2–3; D184 at 3–4.

For attorney's fees, the prevailing party is "the party prevailing on the significant issues in the litigation[.]" *Moritz v. Hoyt Enters., Inc.*, 604 So. 2d 807, 810 (Fla. 1992). "[T]hat a claimant recovers a net judgment is significant

---

[5]Article 5 arguably permits fees outside the "prevailing party" standard; however, NAS does not request fees under Article 5 under that standard—only expenses. *See* D184 at 2–4; D188 at 8–9; D197 at 12–13. The undersigned follows NAS's lead.

but does not necessarily control the determination of the 'prevailing party[.]'" *Trytek v. Gale Indus., Inc.*, 3 So. 3d 1194, 1201 (Fla. 2009); *see also Lemartec Corp. v. E. Coast Metal Structures Corp.*, No. 4D2023-0601, 2024 WL 2178312, at *5 (Fla. 4th DCA May 15, 2024) (to be published) ("[T]he mere fact that a party recovers an affirmative judgment does not control the prevailing party determination, including in breach of contract cases."); *Xiang v. Ocala Heart Clinic II, LLC*, 379 So. 3d 561, 565 n.7 (Fla. 5th DCA 2024) ("[T]he Florida Supreme Court rejected the position that the prevailing party is the party who recovered an affirmative judgment.").

A trial court may determine "that neither party has prevailed on the significant issues in litigation after a thorough examination of all the [circumstances], including the issues litigated, the amount of the claim … versus the amount recovered …, the existence of setoffs and counterclaims …, and the amounts offered by either party to resolve the issues [before] the litigation[.]" *Trytek*, 3 So. 3d at 1203; *accord Skylink Jets, Inc. v. Klukan*, 308 So. 3d 1048, 1053–54 (Fla. 4th DCA 2020) ("The Florida Supreme Court has emphasized a flexible approach that gives the trial courts broad discretion in determining which party is the prevailing party, including the discretion to make a determination that neither party has prevailed on the significant issues in the litigation.").

Although one party usually must prevail in a breach-of-contract action, compelling circumstances may justify finding that neither party prevailed. *Xiang*, 379 So. 3d at 566; *Bauerle v. Bauerle,* 371 So. 3d 969, 971–72 (Fla. 5th DCA 2023); *Klukan*, 308 So. 3d at 1053. "[T]he proposition that a determination of a breach of contract, standing alone, always carries with it

the finding that the non-breaching party is the prevailing party for the purpose of awarding attorney's fees … is contrary to the approach taken by the Florida Supreme Court, which … has taken a more flexible approach by looking to which party prevailed on the significant issues in the litigation." *Perera v. Genovese*, 345 So. 3d 882, 891 (Fla. 4th DCA 2022).

In the joint pretrial statement, the parties agreed the litigation presented three significant issues: (1) "Whether Artec … materially breached the Subcontract" (relevant to Stonebridge's payment bond claim against NAS); (2) "Whether Stonebridge materially breached the Subcontract with Artec" (relevant to NAS's breach of subcontract counterclaim against Stonebridge); and (3) "Whether Stonebridge and Developers materially breached the Performance Bond or otherwise failed to comply with its obligations under the Subcontract to trigger Developers' obligations, if any, under the Performance bond" (relevant to NAS's breach of performance bond counterclaim against Stonebridge and breach of performance bond third-party claim against Developers). D96 at 34, 39, 44. For the first issue, the parties identified thirty-seven sub-issues; for the second issue, twenty sub-issues; and for the third issue, eight sub-issues. *Id.* at 34–45. The litigation presented another significant issue: whether Stonebridge's work caused latent defects entitling NAS to pass-through damages. D179 at 15–16, 25–27.

Under the flexible approach, compelling circumstances exist to warrant a finding that neither party prevailed. On the one hand, Stonebridge successfully defended against the latent-defect claim and pass-through damages claimed to total $4,140,000.00, *id.* at 26–27, on which Stonebridge spent the bulk—sixty-nine percent—of its attorney's fee. On the other hand,

NAS successfully defended against the payment bond claim of $295,871.34 and prosecuted the subcontract and performance bond claims, resulting in the $946,608.55 judgment. *Id*. at 23. When the Court issued the findings of fact and conclusions of law, both parties must have been both pleased and disappointed.

NAS relies heavily on the fact that it obtained a judgment in its favor. *See* D184. The judgment is significant but not controlling. *See Trytek*, 3 So. 3d at 1201.

With Article 5, NAS emphasizes reciprocity under section 57.105(7), Florida Statutes. D184 at 4. Section 57.105(7) provides, "If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract." Fla. Stat. § 57.105(7) (2016). The law merely turns a unilateral fee provision into a bilateral one. *Levy v. Levy*, 326 So. 3d 678, 681 (Fla. 2021). Why NAS emphasizes the law is unclear considering that Article 5 provides a fee award to NAS (as assignee of Artec), not Stonebridge. To the extent NAS emphasizes the law to try to take advantage of a statement in a case that the prevailing party is the party who obtains judgment regardless of the amount awarded, *see* D184 at 3–4 (citing *Deutsche Bank, Nat'l Tr. Co. v. Quintela*, 268 So. 3d 156, 159 (Fla. 4th DCA 2019)), the case does not help NAS. The case goes on to apply the significant-issue standard. *See Deutsche Bank*, 268 So. 3d at 159.

31

Because neither Stonebridge nor NAS is the "prevailing party," neither party is entitled to a fee award under the stipulation, Article 5, or Article 10.

2.      *Fees Under the Performance Bond and Section 627.756(1)*

Under the performance bond, Stonebridge and Developers "shall faithfully perform and fulfill the Subcontract on its part and shall fully indemnify and save harmless [Artec] from all costs, damages, delays, expenses and attorney's fees which it may suffer by reason of failure so to do, and shall fully reimburse and repay [Artec] all outlay(s) and expenses(s) which [Artec] may incur in making good any such default." D163-22 at 3 (emphasis added).

Under section 627.756(1), "[s]ection 627.428 applies to suits brought by owners [and] subcontractors … against a surety insurer under payment or performance bonds written by the insurer[.]" Fla. Stat. § 627.756(1) (2016). Section 627.428, in turn, provides that upon a judgment for an insured or beneficiary on an insurance policy or contract, the court "shall adjudge" for the insured or beneficiary against the insurer "a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had." Fla. Stat. § 627.428 (2016).

As NAS observes, *see* D209 ¶¶5, 17, and as evident from the plain language of section 627.428, which references a "judgment," not a "prevailing party," the significant-issue standard for determining a prevailing party does not apply to a fee award under section 627.756(1), *see Danis Indus. Corp. v. Gd. Improv. Techs., Inc.*, 645 So. 2d 420, 421 (Fla. 1994) (holding that "an insured or beneficiary who prevails is entitled to … fees" and explaining that

32

"[t]he statute offers no similar prospect to the surety, nor does the statute say that the fees will be unavailable if the surety prevails on some but not all of the issues").

The Court found Stonebridge failed to fulfill the subcontract and thus entered judgment for NAS and against Stonebridge and Developers on the subcontract and performance bond claims. D179, D180. Under the performance bond and section 627.756(1), NAS is entitled to attorney's fees.

Neither Stonebridge nor Developers dispute this entitlement except to argue the conflict of interest precludes a fee award. *See* D204.

Rule 4-1.7 of the Rules Regulating The Florida Bar "concerns conflicts of interests with current clients." *Young v. Achenbauch*, 136 So. 3d 575, 581 (Fla. 2014). The rule prohibits a lawyer from representing a client if the representation of one client will be directly adverse to another client unless the lawyer obtains informed consent. Rule 4-1.7, Rules Regulating The Florida Bar. "Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated." *Id.*, Comment ("Loyalty to a Client").

Under Rule 4-1.7, a lawyer ethically must avoid a prohibited conflict, such as undertaking a representation when the lawyer either knows or should know of a conflict prohibiting the representation. *Young*, 136 So. 3d at 582; *Pub. Def., 11th Jud. Cir. of Fla. v. State*, 115 So. 3d 261, 267 (Fla. 2013). A lawyer may withdraw from representation when a conflict arises after representation begins but should decline representation if the conflict exists

33

before representation begins. *Young*, 136 So. 3d at 581 (quoting Rule 4-1.7, Comment ("Loyalty to a Client")).

> Despite a conflict of interest, a lawyer may represent a client if:
>
> (1) the lawyer reasonably believes the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a position adverse to another client when the lawyer represents both clients in the same proceeding …; and
>
> (4) each affected client gives informed consent[.]

Rule 4-1.7(b).

"'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Preamble to the Rules Regulating The Florida Bar. Informed consent must be "confirmed in writing or clearly stated on the record at a hearing. Rule 4-1.7(b)(4). "[T]he writing is required … to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might occur later in the absence of a writing." *Id.*, Comment ("Consent confirmed in writing or stated on the record at a hearing").

The Etcheverry Harrison lawyers may have operated under a conflict of interest to the extent their representation of NAS against Stonebridge was directly adverse to Developers, their longstanding client. An Etcheverry

Harrison lawyer appeared to acknowledge a conflict of interest, at least before the litigation began. *See* D204-3 at 2 ("[I]f [Developers] or Stonebridge commence a claim or litigation [against] … NAS, then a conflict would arise, which would either have to be waived or which would require our Firm to withdraw as counsel for NAS in that matter only."); *but see* D204-4 at 2 ("[Etcheverry Harrison] does not believe there exists any actual and/or potential conflict of interest in connection with its continued representation of NAS in the pending litigation."); D209 at 4 ("The breach of contract claim against Stonebridge, by itself, posed no conflict of interest between … Etcheverry Harrison … and Developers.").

Regardless of any conflict of interest, Developers, a sophisticated client versed in this type of litigation, provided informed consent for the Etcheverry Harrison lawyers to continue representing NAS in this litigation through the letter by Developers' corporate counsel, D204-5, made after an explanation of any conflict of interest, D204-4, and after the claims, defenses, and dual representations were developed and clear to Developers, D26, D27. Developers expressly waived "a conflict of interest" for the Etcheverry Harrison lawyers' "representation of NAS in connection with Stonebridge's claim against NAS under the Artec Bond and NAS's affirmative claims solely against Stonebridge related to the Stonebridge bond." D204-5 at 2.

Developers does not claim the Etcheverry Harrison lawyers violated any of the four conditions on which Developers provided the waiver. *See id*. at 2 ("1. Your firm's representation of NAS in the matter … will not … involve the disclosure or compromise by the firm of [Developers'] confidential information. 2. Your firm acknowledges and agrees that it will not bring any actions for bad

faith or otherwise seek extra-contractual damages against [Developers][.] 3. This … waiver is given with regard to surety matters only and … [Developers] does not waive any conflicts … between the firm and [Developers] related to other matters not involving surety. 4. [T]his does not constitute a blanket waiver going forward. This is a one-time waiver specific to these facts and circumstances. Your firm will seek a similar consent and waiver in the future if conflict should again arise in another matter or if information, facts and/or circumstances related to this matter materially change.").

Rather, Developers argues its waiver matters naught because the waiver was premised on representations—that the Etcheverry Harrison lawyers are not representing NAS on any claim NAS has against Developers and are just defending claims by, and prosecuting claims against, Stonebridge—shown untrue by the lawyer's attempt to argue on behalf of Buckley when the trial ended, D169 at 180–84, by the lawyers' attempt to get fees from Developers now, D184 at 7, and by the lawyers' time records, D184-1. D204 at 6–7, 9.

Developers' claim of surprise is unpersuasive. When the Etcheverry Harrison lawyer tried to argue on behalf of Buckley when the trial ended, Developers' counsel immediately corrected the record to clarify that the lawyer was arguing on behalf of NAS only against Stonebridge. *See* D169 at 185. When they obtained the waiver, the Etcheverry Harrison lawyers' pre-waiver work was known, and their post-waiver work was foreseeable. *See* D178 ¶4 (Developers' acknowledgment that "to trigger Developers' liability under the [performance bond], NAS had to establish that Stonebridge committed a material breach of and defaulted on the Subcontract").

Developers cites pages in timesheets by Etcheverry Harrison timekeepers as evidence that the timekeepers "spent [time] working to assist Buckley with the claims against Developers[.]" D204 at 3 (citing D184-1 at 48, 50, 73, 82, 88, 357, 359–61, 422, 428, 491, 510, 515, 522, 548–49, 562, 567, 625, 639, 640, 642, 64–47, 649, 652, 727–28). Developers fails to explain how the entries on those pages demonstrate a conflict of interest beyond the waiver. *Id*.

Other entries—most less than an hour—include calls with Buckley to discuss mediation, D184-1 at 48; calls with Buckley to discuss trial strategy, *id*. at 73; drafting and issuing a deposition notice to a Developers' agent, *id*. at 416; analyzing contracts between Stonebridge and Developers, *id*. at 428; emails with Buckley about the second amended complaint's language, *id*. at 510; emails with Buckley about Stonebridge's revisions to an order on experts, *id*. at 562; emails with Buckley about sections to include in the pretrial stipulation, *id*. at 567; emails with Buckley to arrange trial testimony, *id*. at 625; emails with Buckley on "surety-specific counter-designations" for depositions, *id*. at 640, 647; emails with Buckley about the trial brief, exhibit list, and witnesses, *id*. at 642, 644; and emails with Buckley about "surety-specific inclusions in trial brief," *id*. at 649. Developers fails to show the work—seemingly necessary for coordination among the lawyers under the dual-representation to which Developers agreed—exceeded the scope of the waiver.

Developers argues the belated nature of the waiver—its provision a year after the litigation began—"terminates any entitlement claim for Etcheverry fees." D204 at 11. Developers relies on *Florida Bar v. Dunagan*, 731 So. 2d 1237 (Fla. 1999). *Id*. In *Dunagan*, the Florida Supreme Court observed, "The

rules state that an attorney *shall not represent* conflicting interests unless the client consents. Especially where the conflict exists prior to the beginning of the representation, this can only mean that the necessary consent should be obtained before the attorney agrees to represent the conflicting interest." *Florida Bar v. Dunagan*, 731 So. 2d 1237, 1241 (Fla. 1999) (emphasis in original). The statement means that, to comply with ethical obligations, a lawyer should timely obtain consent; the statement does not mean that a tardy waiver is null and operates to preclude a fee award. Developers did not limit its waiver to future representation. *See* D204-5 at 2 ("[Developers] is willing to provide this waiver[.]").

Developers complains the waiver does not include consent for the Etcheverry Harrison lawyers to prosecute a claim directly against Developers, like the current fee claim. D204 at 11–12. That complaint does not warrant relief for at least two reasons. First, the waiver excluded "actions for bad faith" and demands for "extra-contractual damages," D204-5 at 2, not a claim for a fee award in this action. Second, although NAS's fee motion signed by an Etcheverry Harrison lawyer is confusing because NAS demands in the wherefore clause judgment against both Stonebridge and Developers, *see* D184 at 7, NAS elsewhere clarifies that it is demanding in the motion fees only against Stonebridge, *see id.* at 3 n.3 ("NAS will refrain from including any argument as to … fees regarding Developers in the instant motion. At the time of the filing of this motion, … Buckley on behalf of NAS and Ty Thompson on behalf of Developers are in discussions to resolve an attorney fee agreement and will file their motion with the Court separately."). In NAS's motion for costs and expenses signed by an Etcheverry Harrison lawyer, NAS requests

costs against only Stonebridge. *See* D188 at 9 ("WHEREFORE, [NAS] respectfully request[s] that this Court enter a Final Judgment against Defendant Stonebridge, finding NAS entitled to its taxable costs[.]"). And in NAS's motion for fees, costs, and expenses signed by Buckley, NAS demands that relief from Developers. *See* D197 at 12 n.10. The Etcheverry Harrison lawyers and Buckley continue to provide dual representation as they have since the outset.

Considering the waiver, the Court need not decide whether a conflict of interest precludes a fee award. In any event, the cases on which Stonebridge and Developers rely do not support a blanket proposition that, under Florida law, a fee award is unavailable to one party if that party's lawyer was operating under a conflict of interest with respect to another party. *See* D204 at 10–11 (citing *James T. Butler, P.A. v. Walker*, 932 So. 2d 1218 (Fla. 5th DCA 2006); *Snyderburn v. Bantock*, 625 So. 2d 7 (Fla. 5th DCA 1993); *White v. Roundtree Transp., Inc.,* 386 So. 2d 1287 (Fla. 3d DCA 1980); *S.E.C. v. Kirkland*, No. 6:06-CV-183-Orl-28KRS, 2008 WL 4144424 (M.D. Fla. Sept. 5, 2008)). Instead, the cases are based on equities and other circumstances particular to them. *See Walker*, 932 So. 2d at 1218–20 (denying a lawyer's motion to apportion settlement proceeds for work performed after a conflict of interest arose); *Snyderburn*, 625 So. 2d at 8, 12 (refusing to enforce a conflicted lawyer's lien against settlement proceeds but adding that the lawyer is not precluded from collecting a fee under "his fee-sharing contract"); *White*, 386 So. 2d at 1288–89 (holding in a wrongful death action that lawyers who had operated under a conflict of interest when representing both a widow and children from a previous marriage were not entitled to part of a contingency fee earned by

other lawyers eventually hired by the children); *Kirkland*, 2008 WL 4144424, at *6 (denying a receiver's motion for attorney's fee from a receivership estate to the extent the fee was for work related to a conflict of interest).

NAS is entitled to fees under the performance bond and section 627.756(1). Considering the waiver, any conflict of interest does not dictate otherwise.

## B.   *Taxable Costs*

In federal court, "[t]he award of costs is governed by federal law." 10 Charles A. Wright & Arthur Miller, *Fed. Prac. and Proc.* § 2669 (4th ed. 2021). This is true generally even if the underlying claim is under state law. *See Stender v. Archstone-Smith Op. Tr.*, 958 F.3d 938, 947 (10th Cir. 2020) ("Because Rule 54(d) falls well within the statutory authorization of the Rules Enabling Act and its displacement of … state law would not impair any state substantive right, … a federal court exercising diversity jurisdiction has no power to award costs under [state law]."); *Humann v. KEM Elec. Coop., Inc.*, 497 F.3d 810, 813 (8th Cir. 2007) ("Humann also contends that the district court erred in taxing costs in accordance with [Rule] 54(d), instead of in accord with state law. The award of costs in federal court is governed by Rule 54(d), rather than by state law that conflicts with Rule 54."); *Carter v. Gen. Motors Corp.*, 983 F.2d 40, 43 (5th Cir. 1993) ("[F]ederal procedural law ordinarily governs the award of costs in diversity cases.").

Rule 54(d) provides,

40

(1) … Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party. …

(2) … A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages. …

Fed. R. Civ. P. 54(d)(1), (2). The rule codifies the "venerable presumption that prevailing parties are entitled to costs." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013).

Rule 54(d)(1) "restricts the number of prevailing parties to one." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 38 F.4th 1372, 1378 (11th Cir. 2022). But the rule permits a finding of no prevailing party. *Id.* at 1379. "Simply put, a district court may find (at most) one prevailing party, but it is not required to do so in every case." *Id.* at 1380. For example, a court may decline to award costs if "both parties [lost] on the claims they asserted" or, stated another way, "both parties successfully [defended] the claims brought against them[.]" *Id.* at 1381.

A party obtains "prevailing party status" under Rule 54(d)(1) if the party satisfies two requirements. *Id.* at 1376. "First, the party must be awarded some relief on the merits of its claim by the court." *Id.* "Second, the party must be able to point to a resolution of the dispute which materially altered the legal relationship between the parties." *Id.* The "party need not prevail on all issues to justify a full award of costs[.]" *Head v. Medford*, 62 F.3d 351, 354 (11th Cir. 1995) (quoted authority omitted). "Usually the litigant in whose favor judgment is rendered is the prevailing party[.]" *Id.* (quoted authority omitted).

41

The Court awarded NAS $946,608.55 in damages on its subcontract and performance bond claims and, thus, NAS received relief on the merits of those claims. D179 at 27. The resulting judgment altered the legal relationship between NAS, Stonebridge, and Developers because the judgment requires Stonebridge and Developers to pay money they had refused to pay. Under these circumstances, NAS is the prevailing party under Rule 54(d)(1). Stonebridge and Developers do not contend otherwise. *See* D186, D190, D204.

Rule 54(d)(1) works with 28 U.S.C. § 1920, under which a court may tax six categories of costs. *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1225 (11th Cir. 2002). The categories are:

(1)     Fees of the clerk [28 U.S.C. § 1914] and marshal [28 U.S.C. § 1921];

(2)     Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3)     Fees and disbursements for printing and witnesses [28 U.S.C. § 1821(b)];

(4)     Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5)     Docket fees under section 1923 of this title; [and]

(6)     Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920(1)–(6).

Section 1920 reflects congressional policy to place "'rigid controls on cost-shifting in federal courts.'" *Parkes v. Hall*, 906 F.2d 658, 659 (11th Cir. 1990) (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444 (1987)). As evident from § 1920, costs are "limited to relatively minor, incidental expenses" and "'almost always amount to less than the successful litigant's total expenses in connection with a lawsuit.'" *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012) (quoted authority omitted). A court may decline to allow costs in § 1920 but may not allow costs outside of § 1920. *Crawford*, 482 U.S. at 442, 445. If a court exercises its discretion to deny full costs, the court "must have and state a sound basis[.]" *Chapman v. AI Transp.*, 229 F.3d 1012, 1039 (11th Cir. 2000).

"Items proposed by winning parties as costs should always be given careful scrutiny." *Farmer v. Arabian Am. Oil Co.*, 379 U.S. 227, 235 (1964), *disapproved of on another ground by Crawford*, 482 U.S. at 442–43. Once the prevailing party has shown the requested costs are allowable under § 1920, the losing party may rebut the presumption favoring their award. *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 639 (11th Cir. 1991). The losing party may rebut the presumption by presenting some rationale under which the court should disallow costs. *168th & Dodge, LP v. Rave Revs. Cinemas, LLC*, 501 F.3d 945, 958 (8th Cir. 2007).

Because of the scrutiny required, the undersigned analyzes all costs NAS requests, including those Stonebridge and Developers do not dispute.

NAS requests $477.00 as "Fees of the Clerk." D188-1 at 1. "Fees of the clerk" are allowed under § 1920. 28 U.S.C. § 1920(1). But NAS fails to show

43

"fees of the clerk" are allowed to NAS in this action. NAS represents "it is beyond dispute that NAS incurred filing fees associated with service of the initial *Complaint for Breach of Contract* upon Stonebridge in the amount of … $400.00 … and fees associated with service thereof in the amount of … $77.00[.]" D188 at 5; *see also* D188-2 (copies of checks showing Etcheverry Harrison paid those amounts). Regarding the $400.00 filing fee, NAS should not have paid the fee because Stonebridge had paid the fee when it initiated this lawsuit. *See* docket entry with D1; D186 at 4. The undersigned has ordered the finance department to refund the fee. D210. Regarding the $77.00 service fee, § 1920 allows a fee of the marshal, 28 U.S.C. § 1920(1), stated in 28 U.S.C. § 1921, which includes a private server's fee up to the amount the marshal charges. *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 624 (11th Cir. 2000). But under Rule 5, Federal Rules of Civil Procedure—the rule for service of a pleading after the original complaint—NAS should have incurred no fee for service on Stonebridge. Instead, service of NAS's complaint against Stonebridge (which was just a counterclaim against Stonebridge), was accomplished for free when NAS filed the pleading through the court's electronic filing system. NAS is not entitled to $477.00 as "Fees of the Clerk."

NAS requests $878.75 as "fees for service of summons and subpoena." D188-1 at 1. Fees of the marshal include fees for "serving a subpoena or summons for a witness[.]" 28 U.S.C. § 1921(a)(1)(B). The marshal may charge $65.00 an hour for each item personally served, plus travel costs and other out-of-pocket expenses, and $0.10 a page for copies. 28 C.F.R. § 0.114(a)(3), (4). If a party requests more than $65.00 without providing evidence of how long service took or whether travel costs or out-of-pocket expenses were incurred,

courts have reduced the award to the "minimum charged by the U.S. Marshal's Service." *See, e.g., James v. Wash Depot Holdings, Inc.*, 242 F.R.D. 645, 649 (S.D. Fla. 2007) (quoted). NAS requests fees for serving subpoenas on five non-parties in amounts ranging from $81.25 to $243.75, D188 at 5, but provides no evidence of how long service took or whether travel costs or out-of-pocket expenses were incurred, *see id*. Rather, NAS merely provides an Etcheverry Harrison expense report showing the amounts were billed or paid. D188-2. NAS fails to show costs exceeding $65.00 per non-party, for a total of $325.00.

NAS requests $11,279.12 as "fees for printed or electronically recorded transcripts necessarily obtained for use in the case." D188-1 at 1. "Rigid rules play no role in determining" whether transcripts or copies are "necessarily obtained for use in the case." *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 337 (5th Cir. Unit B June 18, 1981). A court has "great latitude" in making the determination. *Id.* Still, if the "costs were merely incurred for convenience, to aid in thorough preparation, or for purposes of investigation only, the costs are not recoverable." *W&O*, 213 F.3d at 620 (quoted authority omitted). A court does not abuse its discretion in taxing costs for a deposition transcript used with a summary judgment motion, *id.* at 620–21; for a transcript of a deposition of someone on the losing party's witness list, *Maris Distrib.*, 302 F.3d at 1224–25; or even for a transcript not used at summary judgment or a trial, as long as the transcript was necessarily obtained for use in the case, *In re Fundamental Long Term Care, Inc.*, 753 F. App'x 878, 882 (11th Cir. 2019). Indeed, "it does not matter if the use of" a deposition is "minimal" or "not critical to the party's ultimate success." *Id.* (internal quotation marks and

alteration omitted). "The operative principle is that such costs are taxable when the party opposing the costs has not demonstrated that any portion of the depositions was not related to an issue which was present in the case at the time the deposition was taken." *Id.* (internal quotation marks omitted).

NAS shows the transcripts were necessarily obtained for use in the case as transcripts of depositions of eight people on its witness list, D121, and to prepare proposed findings of fact and conclusions of law, D176. But NAS fails to show all of the fees charged by the court reporters are allowable; specifically, fees for appearances, *see* D188-3 at 4 ($95.00), 5 ($150.00), 6 ($195.00); for remote videoconferencing, *id.* at 6 ($95.00); for condensed transcripts in addition to originals, *id.* at 1 ($25.00), 5 ($20.00), 6 ($20.00), 7 ($50.00), 8 ($20.00), 9 ($25.00); for digital transcripts in addition to originals, *id.* at 1 ($50.00), 6 ($35.00), 8 ($35.00); and for "processing and compliance," *id.* at 1 ($45.00), 5 ($30.00), 6 ($30.00), 7 ($90.00), 8 ($30.00), 9 ($45.00). Without an explanation of what these charges are or how they satisfy the definition of "transcript" in § 1920, NAS has not shown the add-on charges, totaling $1,085.00, are allowable.

NAS requests $151.30 as "fees for exemplification costs and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." D188-1 at 1. A court may not tax costs for general copying, *Duckworth v. Whisenant*, 97 F.3d 1393, 1395, 1399 (11th Cir. 1996), and may exclude costs of copies if the requesting party makes no showing the copies were necessary for use in the case, *see, e.g.*, *Pelc v. Nowak*, 596 F. App'x 768, 771 (11th Cir. 2015) (observing that the court did not abuse discretion in excluding costs of copies because the requesting parties "made no showing that

46

the copies were necessary for use in the case"); *Watson v. Lake Cnty.*, 492 F. App'x 991, 998 (11th Cir. 2012) (remanding for further findings because the district court awarded costs for "B&W printing" and "color copies" but the record did not explain what documents were copied). NAS describes the costs:

> Here, NAS incurred photocopy costs associated with: (a) the service of process of the Complaint for Declaratory Judgment; and (b) the analysis for and preparation of Trial which was obviously "necessarily obtained for use in the case" as same led to NAS being the "prevailing party"; and (C) the preparation and taking of the depositions of Atlantic Engineering, Web Structural Engineers, and Stonebridge's existing and former employees, at which depositions over 120 comprehensive and voluminous exhibits were marked and exchanged with the witnesses and opposing counsel:

| Bill Date | Photocopy Purpose | Per Page | # Pages | Total Amount |
|-----------|-------------------|----------|---------|--------------|
| 4/8/2020 | Outside Copy Service | $.20 | 75 | $151.30 |

D188 at 7. NAS fails to show the photocopy costs associated with "the service of process of the Complaint for Declaratory Judgment" were necessarily obtained for use in the case; no such pleading exists, and service of NAS's pleadings on Stonebridge at least was accomplished through the court's electronic filing system. Because NAS provides a lump sum for all photocopying costs, the Court cannot award any amount in this category.

NAS requests $12,842.76 as "other costs." D188-1 at 1. NAS does not explain these costs. On the bill of costs, NAS's counsel did not even "declare under penalty of perjury that the costs were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed," instead placing opposing counsel's name on the signature line. *Id*. NAS fails to show the costs are allowed.

47

NAS includes in its bill of costs a request for $27,633.78 as "fees for witnesses." *Id.* "Fees and disbursements for printing and witnesses" are allowed under § 1920. 28 U.S.C. § 1920(3). The fees are specified in 28 U.S.C. § 1821(b), which provides, "A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance." For witness fees, a court therefore may tax $40.00 a day plus travel expenses. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 298 (2006). Taxation of expert witness fees beyond the per diem fees in § 1821 is reversible error, even if the underlying claim is under state law.[6] *See Kivi v. Nationwide Mut. Ins. Co.*, 695 F.2d 1285, 1286, 1289 (11th Cir. 1983) (holding "the entitlement to expert witness fees under the Florida Statutes is not a substantive right," reversing an award of $1,000.00 in expert fees, and rejecting the argument that "if the state law provides for an award of expert witness fees they may be assessed as costs by the district court in a diversity case"); *accord Cronin v. Wash. Nat'l Ins. Co.*, 980 F.2d 663, 672 (11th Cir. 1993) (reversing taxation of $10,393.64 in costs, including $5,640.25 in expert witness fees, and remanding with instructions to determine expert fees under § 1821); *Ageloff v. Delta Airlines Inc.*, 860 F.2d 379, 390 (11th Cir. 1988)

---

[6]In *Henning v. Lake Charles Harbor & Terminal District*, the former Fifth Circuit recognized an exception to the rule that a prevailing party in federal court is not entitled to expert fees beyond those in § 1821. 387 F.2d 264, 267 (5th Cir. 1968). The court held that under Louisiana condemnation law, a landowner has a substantive right to expert fees because without them the landowner would not receive just compensation required by the state's constitution. *Id.* "*Henning* has been confined … to such proceedings." *Seal v. Knorpp*, 957 F.2d 1230, 1237 (5th Cir. 1992).

(reversing taxation of expert witness fees beyond the amount authorized by § 1821), *modified on other grounds*, 867 F.2d 1268 (11th Cir. 1989). NAS does not describe the witness or travel fees. NAS fails to show the costs are allowed.

Without elaboration, Stonebridge "objects to any additional costs sought by NAS in its Amended Bill of Costs that were not previously sought as the request is untimely." D190 at 2. NAS moved for costs and filed a bill of costs on October 19, 2023, D185, and an amended motion for costs and amended bill of costs on November 17, 2023, D188. Neither Rule 54(d) nor the Local Rules establish a deadline to file a bill of costs. Stonebridge fails to identify which costs were requested untimely and otherwise insufficiently analyzes untimeliness.

NAS shows entitlement to $10,519.12 ($325.00 + $10,194.12 = $10,519.12) in costs taxable under Rule 54(d) and § 1920.

## C.    *Non-Taxable Expenses*

While "[i]t is true that Rule 54(d), and the presumption of costs allowed under the rule, ordinarily apply only to the costs that Congress defined as taxable under … § 1920, … both the Supreme Court and [the Eleventh Circuit] have long recognized that contractual provisions can circumvent these restrictions on taxable costs." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1166 (11th Cir. 2017); *see also Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 444 (1987) (observing that § 1821 and § 1920 "control a federal court's power to hold a losing party responsible for the opponent's witness fees" unless "overridden by contract or explicit statutory authority").

49

If a contract provision "contains broad enough language to cover the award of
… nontaxable costs related to litigation arising out of the contract," a district
court applying Florida law must enforce the provision. *Yellow Pages*, 846 F.3d
at 1166 (citing *Lashkajani v. Lashkajani*, 911 So. 2d 1154, 1158 (Fla. 2005);
*Price v. Tyler*, 890 So. 2d 246, 250 (Fla. 2004)).

NAS requests $159,357.33 to pay for its engineering expert, William
Dery, under Article 5 (but not Article 10) of Artec and Stonebridge's
subcontract and the performance bond. D188 at 8–9; D197 at 12–13.

Under Article 5, Stonebridge "will be liable to [Artec] for all losses, costs
(including attorneys' fees and court costs)[,] damages, claims, suits, fines or
penalties incurred by [Artec] or its sureties to the extent caused by … default."
D163-21 at 12. Under the performance bond, "[Stonebridge] and [Developers]
shall faithfully perform and fulfill the Subcontract … and shall fully indemnify
and save harmless [Artec] from all costs, damages, delays, expenses and
attorney's fees which it may suffer by reason of failure so to do, and shall fully
reimburse and repay [Artec] all outlay(s) and expenses(s) which [Artec] may
incur in making good any such default[.]" D163-22 at 3.

The language in both Article 5 and the performance bond is broad enough
to cover the expense NAS incurred for Dery and the expenses claimed as— but
not actually—taxable costs. Article 5 defines "costs" to *include* "attorneys' fees
and costs," D163-21 at 12, giving "costs" an expansive meaning beyond taxable
costs. The performance bond allows "costs," "expenses," and "all outlay[s],"
D163-22 at 3, giving "expenses" an expansive meaning beyond "costs." *Cf.*
*Yellow Pages*, 846 F.3d at 1165–66 (holding that a contractual provision

50

entitling the "winning party" to recover "its attorney's fees and costs" was "broad enough language to cover the award of both taxable and nontaxable costs related to litigation arising out of the contract."); *Apple Glen Invs., L.P. v. Express Scripts, Inc.*, No. 8:14-CV-R1527-RT-R33TGW, 2018 WL 2945629, at *18 (M.D. Fla. May 25, 2018), *report and recommendation adopted*, No. 8:14-CV-1527-T-33TGW, 2018 WL 2937469 (M.D. Fla. June 11, 2018) (explaining that "[t]he use of the words 'costs' and 'expenses' denotes that there was an agreement that the prevailing party would be entitled to" nontaxable expenses); Black's Law Dictionary, "expense," (12th ed. 2024) (defining "expense" as "[a]n expenditure of money, time, labor, or resources to accomplish a result").

Stonebridge argues, "Here, the contract allows for NAS to recover its 'court costs'. That language does not alter the standards for what costs are recoverable." D186 at 6. This argument is unpersuasive because it reads the subcontract too narrowly; the subcontract, by its plain language, does not limit "costs" to "court costs." *See* D163-21 at 12.

Stonebridge argues that "to the extent NAS is attempting to argue it is entitled to … Dery's costs because his testimony was necessary, it is clear that … Dery's testimony was not necessary as it was not cited by the Court to find that Stonebridge was in default of the contract." D186 at 6. This argument does not benefit Stonebridge in the context of contractual nontaxable expenses. Unlike § 1920, neither Article 5 of the subcontract nor the performance bond limit expenditures to those necessarily obtained for use in the case. *Compare* 28 U.S.C. § 1920, *with* D163-21 at 12; D163-22 at 3.

51

NAS is entitled to recover the expense NAS incurred for Dery and the expenses now claimed as—but not actually—taxable costs.

### D.  *Reasonableness*

Local Rule 7.01 requires a bifurcated procedure for attorney's fees and nontaxable expenses. Under the rule, "a party claiming a post-judgment attorney's fee and related non-taxable expenses must obtain an order determining entitlement before providing a supplemental motion on amount." Local Rule 7.01(a). If the Court determines entitlement, this procedure applies:

(c) SUPPLEMENTAL MOTION ON AMOUNT. Within forty-five days after the order determining entitlement, the party claiming fees and expenses must file a supplemental motion that:

(1) describes the meet-and-confer effort but preserves any confidential settlement communication;

(2) specifies the resolved and unresolved issues;

(3) includes a memorandum of law on any disputed issue;

(4) includes for any disputed rate or hour:

(A) the timekeeper's identity, experience, and qualification;

(B) the timekeeper's requested hours;

(C) each task by the timekeeper during those hours;

(D) the timekeeper's requested rate;

(E) lead counsel's verification that counsel charges the rate requested, has reviewed each task, and has removed each charge for a task that is excessive, duplicative, clerical, or otherwise unreasonable;

52

(F) evidence showing the reasonableness of the rates based on the prevailing market rate in the division in which the action is filed for similar services by a lawyer of comparable skill, experience, and reputation; and

(5) includes for a disputed non-taxable expense:

(A) a receipt for, or other evidence of, the expense and

(B) lead counsel's verification that counsel incurred the expense.

(d) RESPONSE TO A SUPPLEMENTAL MOTION. A response to a supplemental motion on amount must detail the basis for each Objection, including the identification by day and timekeeper of an unreasonable claim.

Local Rule 7.01(c), (d).

The parties must follow the bifurcated procedure for attorney's fees and expenses. NAS submits billing records and information about timekeepers but provides no reason the Court should suspend the required procedure. *See* D184-1. The procedure requires substantial conferral about rates and hours and is intended to save the parties' and the Court's time and resources.

In conferring about reasonable fees, counsel must consider that neither Stonebridge nor Developers is responsible for NAS's decision to use lawyers at two law firms when lawyers at one law firm would have sufficed.[7] *Compare*

---

[7]*See, e.g.*, D184-1 at 2, 96 (each lawyer billing ten hours for a site inspection and a summary of the same); 2, 95 (one lawyer billing for drafting answer and affirmative defenses, and the other billing for reviewing the same); 16, 333 (same); 3, 99 (each lawyer billing for the same conference call); 3, 100 (same); 4, 108 (same); 10, 119 (same); 12, 214 (same); 15, 316 (same); 15, 301 (same); 17–18, 337–38 (same); 19, 348–49 (same); 21, 351 (same); 22, 359–60 (same); 24, 364 (same); 26, 379 (same); 31–32, 389 (same); 35, 404 (same); 47, 436 (same); 52, 444 (same); 54, 448–49 (same); 6,

D183 at 3 (Stonebridge's fees from one law firm of $652,085.00), *with* D197 at 8 (NAS's fees from two law firms totaling $935,752.08); *see N. Dade Church of God, Inc. v. JM Statewide, Inc.*, 851 So. 2d 194, 196 (Fla. 3d DCA 2003) ("The time sheets also reflect a significant amount of time spent in conferences between the partner and the associate who were working on the case as well as multiple attorneys performing or reviewing the same items. Duplicative time charged by multiple attorneys working on the case are generally not compensable."); *Rathmann v. Rathmann*, 721 So. 2d 1218, 1220 (Fla. 5th DCA 1998) ("While the parties have the right to employ as many lawyers as they choose, the Court will not assess lawyer fees for or against any party for more than one lawyer for a matter in which more than one lawyer is not required."); *Brevard Cnty. v. Canaveral Props., Inc.*, 696 So. 2d 1244, 1245 (Fla. 5th DCA 1997) ("[D]uplicate tasks performed by multiple attorneys does not meet that criterion of reasonableness. … In making an attorney fee award, the court must consider the possibility of duplicate effort arising from multiple attorneys[.]"); *Fla. Birth-Related Neuro. Injury Comp. Ass'n v. Carreras*, 633 So. 2d 1103, 1110 (Fla. 3d DCA 1994) ("The claimants' original counsel elected to enlist co-counsel from another firm who had considerable experience in cases involving infant brain injury. A co-counsel arrangement was agreed to, in

---

109–10 (each lawyer billing for an email exchange with the same people); 7, 112 (same); 9, 152 (same); 6, 120 (one lawyer billing for drafting a letter, and the other billing for reviewing the same); 23–24, 361 (same); 14–15, 313 (each lawyer reviewing revisions to the same document); 32, 390–91 (each lawyer working on and revising the litigation budget); 38, 410 (one lawyer billing for drafting a motion, and the other billing for reviewing the same); 40–41, 411, 417 (one lawyer billing for drafting a mediation statement, and the other billing for reviewing and revising the same); 39, 412 (each lawyer reviewing the same proposed certified claim); and 43, 429 (each lawyer attending mediation).

which each counsel performed part of the work. Over the course of the case, this resulted in a significant number of hours being reflected on counsels' respective time sheets as time communicating with each other. Such duplicate time should be eliminated. … While it is claimants' prerogative to use co-counsel, we do not think that the intercommunication time can be fairly charged against NICA."); *Tomaino v. Tomaino*, 629 So. 2d 874, 875 (Fla. 4th DCA 1993) ("[B]oth prominent high-priced lawyers worked on the case plus various associates and paralegals from their respective offices. While there was some testimony that they did not duplicate each other's efforts, … that was not the case. For instance, if … the Florida attorney[] drafted a pleading, he would send it to … the Illinois attorney[] to review. By the credentials they presented …, both attorneys were very prominent, skilled members of the marital bar. It does not require one three hundred dollar an hour attorney to review the work of another equally expensive attorney. One is clearly enough. Even efforts to charge for the appearance of both lead counsel at hearings, depositions, and trial should be carefully scrutinized to avoid duplication and excessive fees[.] This is not the case of the lead counsel having the assistance of associates. Instead, we have two lead counsels both charging top dollar for their duplicative efforts. Nothing was shown that the services of both were essential."). Counsel also must carefully review and omit time entries for errors

55

and for fees related to the conflict of interest for which neither Stonebridge nor Developers is responsible.[8]

## V.   Recommendations

The undersigned recommends:

(1)     **granting** Stonebridge's motion, D183, to the extent Stonebridge moves for a determination that no party prevailed under the stipulation and Article 10 of Artec and Stonebridge's subcontract and otherwise **denying** the motion;

(2)     **denying** NAS's motion for attorney's fees under the stipulation and Articles 5 and 10 of Artec and Stonebridge's subcontract, D184;

(3)     **granting** NAS's motions for taxation of costs, D188, D197, to the extent NAS moves for taxable costs, taxing costs of $10,519.12 for NAS and against Stonebridge and Developers, entering a corresponding judgment, and otherwise **denying** the motions;

(4)     **granting** NAS's motion for attorney's fees and expenses, D197, to the extent NAS moves for a determination that NAS is entitled to attorney's fees and expenses under the performance bond and section 627.756(1) and otherwise **denying** the motion; and

(5)     **directing** the parties to follow the second part of the bifurcated procedure in Local Rule 7.01 and **ordering** NAS

---

[8]*See, e.g.*, D184-1 at 10 (review and analysis of potential conflict); 43 (research on the potential conflict); 44 (work on waiver of conflict letter); 46 (conferral and work on the conflict letter); 48 (conferral on the conflict), 84 (work on conflict letter); 430–31 (same); 436 (conferral on the conflict); 690 (billing 7.1 hours for an email the timekeeper recorded as 0.3 hours).

to file a supplemental motion with the information required by Local Rule 7.01(c)(1)–(5) within forty-five days of the order determining entitlement.

## VI.   Deadlines for Objections and Responses

"Within 14 days after being served with a copy of [a] recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A [district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). "A party failing to object to … findings or recommendations … in a report and recommendation … waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions[.]" 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on July 31, 2024.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     The Honorable Brian Davis
       Counsel of record

57